

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 17, 2023**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 20-41569-ELM |
| STEVEN KUPER and | § | |
| CANDICE KUPER, | § | Chapter 7 |
| | § | |
| _____Debtors._____ | § | |
| | § | |
| BELL NUNNALLY & MARTIN LLP, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 20-04062 |
| | § | |
| STEVEN KUPER and | § | |
| CANDICE KUPER, | § | |
| | § | |
| _____Defendants._____ | § | |

## <u>MEMORANDUM OPINION</u>

In this action, Plaintiff Bell Nunnally & Martin LLP ("**BNM**") has filed suit against Steven

and Candice Kuper, the chapter 7 debtors in Case No. 20-41569 (the "**Bankruptcy Case**"), to both

object to the Kupers' discharge under section 727 of the Bankruptcy Code and to seek a

determination that the debt owed by the Kupers to BNM is nondischargeable under section 523 of

the Bankruptcy Code.

First, pursuant to section 727(a)(2)(A), BNM claims that the Kupers should be denied a discharge because within one year of the Kupers' bankruptcy filing, and with the alleged intent to hinder, delay, or defraud their creditors and/or the chapter 7 trustee, the Kupers transferred a boat to their son for no consideration and also allegedly took actions to conceal the existence of one of Mr. Kuper's paychecks and a bank account allegedly owned by the Kupers.[1]  Pursuant to section 727(a)(4), BNM further claims that the Kupers should be denied a discharge because they allegedly knowingly and fraudulently made false oaths in connection with their bankruptcy case by misstating or failing to disclose, as applicable, material information on their schedules and statements with respect to the above-mentioned paycheck and bank account, the Kupers' alleged liability for certain debts of FW Medical Supplies, LLC, and Mr. Kuper's income.[2]  Finally, BNM asserts that the debt owed by the Kupers to BNM should be excepted from discharge pursuant to section 523(a)(2)(A) of the Bankruptcy Code because the debt is for services allegedly obtained by Mr. Kuper through false representations and actual fraud.[3]

The Kupers timely filed their answer in opposition to BNM's Complaint.[4]  In relation to BNM's objections to discharge under section 727, the Kupers deny having fraudulently transferred the boat to their son, deny having attempted to conceal the existence of any of their property, and deny having knowingly and fraudulently made any misstatements or omissions on their schedules and statements.  In relation to BNM's request for an exception to discharge under section 523, the

---

[1] *See Complaint Excepting to Discharge of Debtors Pursuant to 11 U.S.C. § 523 and Objecting to Discharge of Debtors Pursuant to 11 U.S.C. § 727* [Docket No. 1] (the "**Complaint**"), ¶¶ 32–44.

[2] *See id.*, ¶¶ 45-51.  To the extent that BNM's objection to discharge under section 727(a)(4) has been predicated upon the alleged nondisclosure of certain vehicle transfers, the Court has previously overruled such objection on summary judgment.  *See Order on Defendants' Motion for Summary Judgment* [Docket No. 25].  Therefore, to such extent, the objection will not be discussed further herein.

[3] *See* Complaint, ¶¶ 23–31.

[4] *See Defendants' Answer to Complaint Excepting to Discharge of Debtors Pursuant to 11 USC § 523 and Objecting to Discharge of Debtors Pursuant to 11 USC § 727* [Docket No. 7] (the "**Answer**").

Kupers assert that they never made any statements to BNM that they knew to be false, never directed anyone else to make any false statements of any kind to BNM, and did not engage in any actual fraud.[5]

Having now considered BNM's Complaint, the Kupers' Answer, the parties' Statement of Stipulated Facts,[6] the parties' other pretrial submissions,[7] the evidence introduced at trial, and the arguments of counsel, the Court issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[8]

## JURISDICTION

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of

---

[5] As part of the prayer for relief in their Answer, the Kupers also request that they be reimbursed for their reasonable and necessary costs, including attorney's fees, in defending against the Complaint, ostensibly invoking the provisions of 11 U.S.C. § 523(d). *See* Answer, ¶ 48; *see also* 11 U.S.C. § 523(d) ("If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust"). Such request, however, was not preserved by the Kupers in the parties' Joint Pretrial Order. *See Proposed Joint Pretrial Order* [Docket No. 29] (the "**Joint Pretrial Order**"); *Order Approving and Adopting Joint Pretrial Order and Setting Trial* [Docket No. 42] (approving and adopting the Joint Pretrial Order). *See Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 245 (5th Cir. 2005) ("It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented at trial without objection"). Moreover, the Kupers failed to introduce any evidence at trial with respect to the costs and attorney's fees allegedly incurred in defending against the § 523(a)(2)(A) claim.

[6] *See Proposed Joint Pretrial Order* [Docket No. 29] (the "**Joint Pretrial Order**"), ¶¶ II.1-II.9 (the "**Stipulated Facts**").

[7] *See* Docket Nos. 30-32.

[8] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

Texas is proper under 28 U.S.C. § 1409.  The proceeding constitutes a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(I) and (J).

## *FACTUAL BACKGROUND*

Steven Kuper is a graduate of Texas Tech University, holding both an undergraduate degree in biology and a doctorate degree in pharmacy.  Steven and Candice Kuper were married in the late 1990s while Mr. Kuper was pursuing his undergraduate degree.  Upon Mr. Kuper's graduation from pharmacy school, the Kupers moved to the Fort Worth area where Mr. Kuper worked as a pharmacist for Walgreens and thereafter Central Line Infusion and Kindred Pharmacy.

In 2010, Mr. Kuper founded FW Medical Supplies, LLC ("**FW Medical**"), a medical device sales company specialized in the marketing and sale of spine-related medical devices, and he refocused his attention to FW Medical.  After operating the business for a few years, Mr. Kuper decided to open his own pharmacy and in late 2013, Mr. Kuper began the process of lining up the necessary financial resources to open the pharmacy.  In addition to committing between $200,000 and $300,000 of his own money, Mr. Kuper secured a $25,000 loan from Christina and Josh Moore, Mr. Kuper's sister and brother-in-law, who separately owned a pharmaceuticals business.

In 2014, Mr. Kuper successfully opened the new pharmacy in Burleson, Texas, naming it Dandy Drug.  Mr. Kuper repurposed FW Medical to manage Dandy Drug's business operations. As such, FW Medical entered into a number of purchasing and financing relationships with Dandy Drug's vendors and customers.  Mr. Kuper personally guaranteed certain of the obligations.  For the next two years, Dandy Drug operated as a successful pharmacy.

### A.    *Mr. Kuper is Indicted for Healthcare Fraud and Hires BNM*

In October 2016, Mr. Kuper was arrested and charged with conspiracy to commit health care fraud and related offenses.[9]  Pursuant to the indictment, the government alleged that Mr. Kuper, through Dandy Drug, paid kickbacks to marketing groups in exchange for their referral of prescription orders to Dandy Drug.[10]  If convicted, Mr. Kuper faced up to 30 years in federal prison and a $250,000 fine.[11]

Prior to the indictment, BNM had represented Mr. Kuper and his businesses from time to time for several years.  Thus, Mr. Kuper looked to BNM for assistance and was directed to Jeff Ansley, one of BNM's attorneys specialized in white collar criminal defense.  As part of the intake process, Mr. Ansley had a discussion with Mr. Kuper with respect to Mr. Kuper's ability to pay BNM's fees.  While Mr. Ansley did not provide an estimate of the total legal fees that would be incurred should the case go to trial, he did advise Mr. Kuper that defending the case would likely be very expensive.  Mr. Kuper told Mr. Ansley that he believed that his business income would be sufficient to enable him to keep up with the fees.

On November 2, 2016, Mr. Kuper formally engaged BNM, with Mr. Ansley serving as lead counsel throughout the engagement.  Pursuant to the engagement agreement, Mr. Kuper agreed to compensate BNM on an hourly basis at hourly rates between $560 and $615.  He also provided an initial $200,000 retainer to BNM.  Thereafter, BNM sent Kuper regular monthly invoices, applying the retainer towards fees and expense incurred until it was exhausted.

---

[9] *See* Stipulated Facts, ¶ 1.

[10] *See* Stipulated Facts, ¶ 2.

[11] *See* Stipulated Facts, ¶ 1.

**B.**     *The Pharmacy Business Collapses and Dandy Drug Closes*

Ultimately, Mr. Kuper's pharmacy business fell apart and Dandy Drug closed at the end of November 2016.  The closing left FW Medical shackled with multiple unpaid financial obligations associated with its operation of Dandy Drug, certain of which had also been guaranteed by Mr. Kuper.

Notwithstanding the closing, Mr. Kuper remained hopeful that the collection of outstanding accounts receivable and the liquidation of inventory would bring in enough cash to both cover the outstanding obligations and Mr. Kuper's legal expenses.  Such hope was later dashed, however, when the pharmacy's receivables were seized by the government and the liquidation of inventory failed to cover existing obligations.

With Dandy Drug closed, the Kupers turned their attention to reordering their financial affairs.  In early 2017, Mr. Kuper went to work for his brother, operating heavy machinery for an annual salary of $60,000.  The Kupers also needed to find a way to reduce their expenses.  Thus, in 2018, they decided to downsize their home.  Anticipating that they would face difficulty in financing the purchase of a new, less expensive home (given the indictment), Mr. Kuper sought the assistance of his sister and brother-in-law, the Moores.  The Moores agreed to help.  Thereafter, the Kupers successfully sold their existing home for $565,000, netting roughly $228,000.  Then in September 2018, the Kupers purchased a new home for $259,000, using $100,000 of the sales proceeds as a down payment and financing the remaining $159,000 with the assistance of the Moores.

Then, in February 2019, Mr. Kuper took a better paying job at K&K Consulting ("**K&K**"), a medical device sales company.  There, he made the equivalent of the same base annual salary of $60,000, but with the opportunity to earn commissions for client development and additional product sales.

**C.**     ***Fees and Expenses Increase in Advance of Trial; Concerns Arise with Respect To Ability to Pay; BNM Relies Upon Representations of Family Support***

After several years, the criminal case was finally set for trial in July 2019.  As the trial neared, BNM's preparatory actions increased and so did the amount of its fees and expenses.  By June 2019, the initial retainer was fully exhausted and despite best efforts to live more frugally and earn more money, Mr. Kuper came to the realization that he had no hope of keeping up with BNM's ongoing fees.  Consequently, on June 27, 2019, he reached out to Mr. Ansley with a request to "discuss finances."[12]

The next day, on June 28, 2019, Mr. Ansley and Mr. Kuper spoke telephonically.  Mr. Kuper candidly informed Mr. Ansley about his inability to pay.  He offered to let Mr. Ansley out of the engagement and to pivot to a public defender.  While Mr. Ainsley was unhappy with the situation, he declined to seek his and the firm's withdrawal from the representation because, given the proximity to trial, he did not believe the court would permit a withdrawal.  Instead, Mr. Ansley urged Mr. Kuper to pursue help from his family.  Among the potential contributors identified was Richard Malouf, DDS, Mr. Kuper's uncle.  Dr. Malouf was a highly successful and wealthy dentist in the Dallas area.  Inasmuch as Dr. Malouf was an unindicted alleged co-conspirator in the criminal case, Mr. Ansley believed that Dr. Malouf would be highly motivated to assist.  Mr. Kuper similarly expressed his belief to Mr. Ansley that Dr. Malouf would assist with the cost of defense.[13]

Fortuitously, Mr. Ansley had a preexisting meeting scheduled with Dr. Malouf that same day to address Dr. Malouf's testimony at trial.  He used the meeting as an opportunity to visit with Dr. Malouf on obtaining his assistance in funding Mr. Kuper's defense.  In response, Dr. Malouf informed Mr. Ansley that he intended to sell his house and that the sale could serve as a source of

---

[12] *See* Defs.' Exh. 14.

[13] *See* Stipulated Facts, ¶ 5.

funds to pay for the fees. Encouraged by Dr. Malouf's seeming willingness to assist, Mr. Ansley scheduled a date to visit Dr. Malouf's house to get a sense of its value, and after visiting the house determined that a sale would likely cover all of BNM's anticipated fees. Indeed, the house (a mansion) was eventually listed for sale at $23 million.

Ultimately, the start of the trial was moved to October 2019 and by the end of September 2019, BNM had hundreds of thousands in unpaid fees and expenses.[14] Because Dr. Malouf's house had not yet been sold, Mr. Ansley used an existing witness preparation meeting on September 28, 2019, between his associate, Arianna Goodman, and the Moores (Mr. Kuper's sister and brother-in-law) as an opportunity to also approach the Moores for financial support. Specifically, as the Moores were leaving the BNM office, Mr. Ansley pulled them aside to discuss Mr. Kuper's financial situation. Mr. Ansley told the Moores that Mr. Kuper was facing mounting litigation expenses and that he needed to ask everyone he knew for financial help. While Mr. Kuper was also meeting with BNM attorneys that day, he did not see the Moores and was unaware of Mr. Ansley's plan to approach them.

Prior to hearing from Mr. Ansley, the Moores were unaware of Mr. Kuper's mounting legal fees. Mr. Kuper had neither requested the Moores' assistance in paying for the fees nor asked the Moores to talk to Mr. Ansley about it. As a result, the Moores were surprised by Mr. Ansley's direct plea for assistance. Nevertheless, having already assisted the Kupers with their purchase of a new home in 2018, the Moores were willing to provide some additional lending assistance, at least to the limited extent that they were financially able. As such, Mrs. Moore reached out to Mr. Kuper and agreed to provide a home-equity line of credit of up to approximately $109,000, secured by the Kupers' house. Mr. Kuper accepted the offer. In October 2019, the home equity loan closed

---

[14] *See generally* Defs.' Exh. 5.

and Mr. Kuper used the loan proceeds to reduce the outstanding balance of BNM's fees and certain litigation expenses.

That said, there were still unpaid legal fees and the fees were continuing to be incurred without payment.  Consequently, on October 1, 2019, Mr. Kuper emailed Dr. Malouf directly to determine the status of his assistance, telling him that "the time has come for you to help with these legal fees" and that Mr. Ansley had informed him that he was "confident a conviction is much higher without the necessary funding."[15]  Mr. Kuper added that, without additional resources, BNM had informed Mr. Kuper that Ms. Goodman would no longer be staffed on his case.  Mr. Kuper additionally pleaded with Dr. Malouf to be attentive to BNM's communications, noting the importance of his testimony, and that Mr. Ansley and Ms. Goodman had expressed their belief that Mr. Kuper "would not be in this situation if it was not for [Dr. Malouf] and [his] actions."[16]

Shortly thereafter, Dr. Malouf responded, indicating that he was unable to provide immediate help.  According to Dr. Malouf, he was suffering his "own financial melt down," he could not "get a loan on [his] house or anything else for that matter," and he was "in jeopardy of losing it as [he] can no longer carry it."[17]  He reiterated that he had "done all [he] [could] at the moment to offer financial assistance unless [his] house sells," but that if he could "find some liquidity to help [him] [he] [would,] but that is the state of affairs as of right now."[18]

**D.     *The Trial and Acquittal; Dr. Malouf Fails to Honor His Promise to Assist***

On October 17, 2019, the jury impanelment process began and on October 22, 2019, the trial began.  The trial lasted six weeks, during which time Mr. Ansley and Ms. Goodman put in

---

[15] *See* Defs.' Exh. 12.

[16] *See id*.

[17] *See id*.

[18] *See id*.

yeoman's work on Mr. Kuper's behalf. Throughout the trial, Mr. Kuper's legal team worked in excess of 90 hours per week while only sleeping for a few hours each night. Ultimately, the BNM trial team's hard work paid off, and on December 17, 2019, Mr. Kuper was acquitted of all charges.[19]

In the midst of the trial proceedings, on December 2, 2019, Dr. Malouf successfully sold his house. However, none of the sales proceeds were paid to BNM to cover any of Mr. Kuper's fees and expenses. Mr. Kuper did not know that Dr. Malouf was planning to renege on his offer to assist and did not become aware of the house sale until January 2020, when Mr. Ansley informed him of it. Like Mr. Ansley, Mr. Kuper believed at all times that Dr. Malouf was going to use some of the sales proceeds to pay down the balance owed by Mr. Kuper to BNM.

### E.    The Kupers Determine to Seek Bankruptcy Protection

Following the acquittal, Mr. Ansley and Mr. Kuper briefly discussed BNM's outstanding fees and expenses. At that time, Mr. Kuper needed some time to decompress. In 2020, however, after learning of Dr. Malouf's failure to fund and considering his financial prospects in the face of an outstanding BNM balance of $875,007.88 in fees and expenses,[20] Mr. Kuper approached Mr. Ansley with an offer to begin paying down the BNM debt at a rate of $500 per month. Mr. Ansley took the offer to the firm's internal counsel, but BNM rejected the offer as insufficient.

Consequently, facing a hopeless situation in combination with their exposure on certain unpaid FW Medical debt, the Kupers determined to seek bankruptcy advice. The Kupers first met with bankruptcy attorney Matthew Wegner in March 2020. While Mr. Kuper had previously kicked around the idea of pursuing bankruptcy protection, he had never followed through with it

---

[19] Stipulated Facts, ¶ 2. The parties further stipulated at trial that the reference to December 17, 2020 in such stipulation was in error and was intended to refer to December 17, 2019.

[20] See Defs.' Exh. 5.

and the Kupers' meeting with Mr. Wegner was their first time that they obtained advice with respect to a possible filing.  At the meeting, Mr. Wegner discussed the bankruptcy process and options.  Ultimately, the Kupers decided to retain Mr. Wegner as bankruptcy counsel and thereafter worked with Mr. Wegner to complete all required initial filings, including a bankruptcy petition and necessary schedules and statements.

With Mr. Wegner's assistance, the Kupers completed and signed their initial filings on April 8, 2020.  Due to timing complications within Mr. Wegner's firm caused by the COVID-19 pandemic, however, the petition and initial schedules and statements were not filed until three weeks later, on April 29, 2020 (the "**Petition Date**").  Upon the filing, Marilyn Garner (the "**Trustee**") was appointed to serve as trustee of the Kupers' bankruptcy estate.

### F.    *Relevant Disclosures*

As previously indicated, BNM has predicated its § 727 discharge objections on the Kupers' alleged fraudulent transfer or concealment, as applicable, of a boat, paycheck, and checking account, and the Kupers' alleged misstatement or failure to disclose, as applicable, of material information with respect to the paycheck, the bank account, their alleged liability on certain debts of FW Medical, and Mr. Kuper's income.  Thus, the Kupers' disclosures in relation to these matters are detailed herein.

#### 1.    *The Boat Transfer*

On December 1, 2019, while the Kuper family was awaiting a verdict in Mr. Kuper's trial, the Kupers gave a boat that they owned, a 1993 Bayliner, to their eldest son, Michael.[21]  Michael gave nothing to his parents in return for the boat.  At the time of the transfer, the boat was not running and was sitting abandoned in a pasture at Mr. Kuper's brother-in-law's house.  According

---

[21] *See* Stipulated Facts, ¶ 8.

to Mr. Kuper, it would have taken about $1,400 to restore the engine alone. Plus, there was considerable damage to the hull that needed repair.[22] As such, Mr. Kuper considered the boat to be more of a burden than anything and he was planning to scrap it or give it away. Because Michael had always wanted a boat and had recently moved into a house where he would have space to store it, however, the Kupers agreed to give it to him instead.

The Kupers disclosed the transfer in their Statement of Financial Affairs ("**SOFA**"). In particular, in response to Question 18 of the SOFA that requires the disclosure of transfers outside of the ordinary course of business within two years of the bankruptcy filing, the Kupers disclosed the transfer, assigning an estimated value of $2,000 to the boat despite its non-working, damaged state.[23] As of the time of trial in this adversary proceeding, the boat remained non-operational and locked up in their son's shed.

### 2.    *The April Paycheck*

On April 25, 2020, after the Kupers had completed and signed their schedules but prior to the Petition Date, Mr. Kuper received a paycheck from K&K in the amount of $9,600 (the "**April Paycheck**"). Despite receiving the paycheck prior to the Petition Date, Mr. Kuper did not deposit the paycheck until May 1, 2020, after the Petition Date. Because the schedules had been completed and signed prior to Mr. Kuper's receipt of the April Paycheck, the paycheck was not disclosed as an asset of the Kupers on Schedule A/B.[24] Following the Petition Date, the Kupers did not amend Schedule A/B to disclose the April Paycheck.

---

[22] *See* Defs.' Exh. 9.

[23] *See* Defs.' Exh. 1, at p.43 (response to SOFA Question 18).

[24] *See* Defs.' Exh. 1, at pp.9-16 (Schedule A/B).

### 3.     The BBVA Account

Prior to the Petition Date, the Kupers helped their son, Cameron, set up his own bank account at BBVA (the "**BBVA Account**").  Cameron was working at the time and because he was still a teenager, he needed an adult to jointly open the account with him.  Consequently, Mrs. Kuper assisted and the account was opened in the name of both Cameron and Mrs. Kuper.[25]

Outside of reimbursing Cameron from time to time for household expenses he covered and aiding Cameron in paying for some car repairs, the Kupers made no contributions to the BBVA Account and the Kupers never took any money out of the account.  At all relevant times, the BBVA Account was treated by the Kupers as an account owned and used solely by Cameron.  Accordingly, the Kupers did not disclose the BBVA Account as an account of their own on Schedule A/B.[26]

### 4.     FW Medical-Related Liabilities

Among the liabilities scheduled by the Kupers were three different debts related to FW Medical's operations (collectively, the "**FW Medical-Related Debts**").

First, the Kupers scheduled Anda with a claim of $26,288.85.[27]  Anda Incorporated was one of Dandy Drug's major vendors.  FW Medical entered into a credit agreement with Anda on behalf of Dandy Drug to facilitate the ordering of pharmaceutical products.[28] Mr. Kuper provided a personal guaranty.  Hence, the Kupers scheduled the outstanding debt owed by FW Medical to Anda as a debt owed by Kupers based upon the personal guaranty.

---

[25] *See* Defs.' Exh. 10 (April-May 2020 account statement for BBVA Checking Account).

[26] *See* Defs.' Exh. 1, at pp.9-16 (Schedule A/B).

[27] *See* Defs.' Exh. 1, at p.23 (Schedule E/F, line 4.1).

[28] *See* Defendants' Exh. 4 (form of Anda Incorporated Credit Agreement/Application executed by FW Medical).

Second, the Kupers scheduled Capital One with a claim of $31,499 based upon a personal credit card that Mr. Kuper had with Capital One.[29]  While Mr. Kuper used the credit card to effectively provide credit to FW Medical for the benefit of Dandy Drug, the card was nevertheless in the name of Mr. Kuper.  Indeed, prior to the Petition Date, Capital One obtained a judgment against the Kupers for non-payment.[30]  Accordingly, the Kupers scheduled the outstanding balance as a debt of their own.

Finally, the Kupers scheduled Express Scripts with a claim of $168,606.[31]  Express Scrips is a provider of prescription insurance.  Prior to the Petition Date, Express Scripts paid Dandy Drug on some prescription claims that were ultimately denied.  Because it was around the time of Dandy Drug's closure, Mr. Kuper deposited the payment into the Kupers' personal account.  After the claims were denied, a refund was owed to Express Scripts for the overpayment.  For a variety of reasons, the overpayment was not reimbursed to Express Scripts prior to the Kupers' completion and execution of their schedules.  Accordingly, the Kupers scheduled Express Scripts as holding a direct claim against the Kupers based upon their belief that they were personally liable given the deposit of the funds in their personal account.

### 5.    *Mr. Kuper's Income*

Prior to the Petition Date, Mr. Kuper was paid once per month by K&K with the amount earned during each particular month generally paid by check issued by the 25th day of the following month.  Thus, as of the time of the Kupers' completion and execution of their schedules and statements on April 8, 2020, payments received by Mr. Kuper during the prior six months were

---

[29] *See* Defs.' Exh. 1, at p.24 (Schedule E/F, line 4.4).

[30] *See* Defs.' Exh. 2.

[31] *See* Defs.' Exh. 1, at p.25 (Schedule E/F, line 4.8).

for work performed between the months of September 2019 and February 2020 and totaled roughly $42,268, or an average of $7,044.67 per month.[32]

Using this information, the Kupers listed on their Statement of Current Monthly Income that Mr. Kuper's average gross monthly compensation for the six-month period preceding the bankruptcy filing was $7,044.67 per month.[33]   Notwithstanding the gap in time between the statement's completion and the Petition Date, the calculation was consistent with the statement's instructions.[34]   Separately, for purposes of disclosing Mr. Kuper's then-current income on Schedule I, the Kupers listed Mr. Kuper's gross income as $7,300 as of April 8, 2020, an amount slightly higher than the prior six-month average.[35]   While Mr. Kuper had earned more than $7,300 in certain of the months preceding the completion of Schedule I, $7,300 was within the range of monthly payments historically received by Mr. Kuper prior to the Petition Date.

## *DISCUSSION*

As of the Petition Date, the principal amount of the outstanding debt owed by the Kupers to BNM was $876,617.88 (the "**BNM Debt**").[36]   BNM seeks to except the BNM Debt from the Kupers' discharge by objecting to the grant of any discharge at all pursuant to sections 727(a)(2)(A) and 727(a)(4) of the Bankruptcy Code, and by objecting to the dischargeability of the BNM Debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code.   Each of these grounds for relief is considered in turn.

---

[32] *See* Defs.' Exh. 11 (copies of paychecks for amounts earned between 9/2019 and 2/2020).

[33] *See* Defs.' Exh. 1, at p.59 (Statement of Current Monthly Income, line 2 (Debtor 1)).

[34] *See id.* (directing a debtor to calculate the average based upon amounts received during the 6 full months preceding the date of the filing).

[35] *See id.*, at pp.31-32 (Schedule I, line 8a. (Debtor 1), and detail provided on the following page).

[36] *See* Stipulated Facts, ¶ 3.

## A.      The Section 727(a)(2)(A) Objections

In relevant part, section 727(a)(2)(A) of the Bankruptcy Code provides for the denial of a chapter 7 discharge to a debtor if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred … or concealed … property of the debtor, within one year before the date of the filing of the petition."[37]  Thus, based upon such statutory language, to establish that a discharge should be denied to a debtor under § 727(a)(2)(A), a creditor must establish the following four elements: "(1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; [and] (4) with intent to hinder, delay, or defraud a creditor or officer of the estate."[38]  Importantly, in the last case, the level of intent that must be shown is actual intent, as opposed to constructive intent.[39]  BNM bears the burden of proving each of these elements by a preponderance of the evidence.[40]

### 1.      The Boat Transfer

BNM first focuses on the Kupers' transfer of the boat to their son, Michael.  In relation to such transfer, the Kupers do not contest the first three elements of the § 727(a)(2)(A) objection and the Court finds that BNM successfully proved each of those elements.  The Kupers only dispute the final element – *i.e.*, that the transfer was made with the intent to hinder, delay, or defraud any of their creditors or the Trustee.

---

[37] *See* 11 U.S.C. § 727(a)(2)(A).

[38] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005) (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989)).

[39] *Pratt*, 411 F.3d at 565 (citing *Chastant*, 873 F.2d at 91); *see also Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 698 (5th Cir. 2009).

[40] *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003) (citing *Chastant*, 873 F.2d at 90-91).

In proving actual intent with respect to an alleged fraudulent transfer, an objector may rely upon either direct evidence of intent (rarely available) or circumstantial evidence of intent based upon an evaluation of the following six factors or badges of fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.[41]

Here, two such badges of fraud clearly exist – the lack of any consideration and a transfer to a relative. Significantly, in the latter case, courts have applied a presumption of fraudulent intent where the transfer has been made to a relative.[42] Such presumption, however, is rebuttable and simply shifts the burden to the debtor to demonstrate a lack of fraudulent intent.[43] With that in mind, the Kupers have successfully established that the boat was of nominal value and that they were planning to simply scrap it in the absence of their son's desire to attempt to refurbish it. "Although a transfer to a relative might suggest intent, a minimal transfer just as strongly suggests a lack of intent."[44] Additionally, the Kupers established that they retained no continuing interest in or possession or use of the boat after the transfer and that the transfer had no material effect on their overall financial position. Finally, the Kupers also timely disclosed the transfer in their

---

[41] *Duncan*, 562 F.3d at 698 (quoting *Chastant*, 873 F.2d at 91 (quoting *Fox v. Schmit (In re Schmit)*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987))).

[42] *See Chastant*, 873 F.2d at 91 (citing *National Bank of Pittsburg v. Butler (In re Butler)*, 38 B.R. 884, 888 (Bankr. D. Kan. 1984)).

[43] *Chastant*, 873 F.2d at 91.

[44] *Dennis*, 330 F.3d at 702.

SOFA, thereby providing the Trustee sufficient information to pursue avoidance of the transfer and recovery of the boat, if deemed warranted.  The Trustee undertook no such effort.

Thus, having considered all of the foregoing factors, the Court finds that the Kupers have successfully rebutted any presumption of fraudulent intent and that BNM has not otherwise carried its burden of proving by a preponderance of the evidence that the Kupers transferred the boat to their son with an intent to hinder, delay, or defraud any of their creditors or the Trustee.

### 2. *The April Paycheck*

BNM next focuses on the $9,600 April Paycheck received by Mr. Kuper on April 25, 2020, asserting that the Kupers intentionally concealed the existence of the paycheck.  The Kupers do not contest the second and third elements of BNM's § 727(a)(2)(A) objection – *i.e.*, that the April Paycheck constituted property of the Kupers and that the alleged action/inaction complained of took place within one year of the Petition Date – and the Court finds that BNM successfully proved each of those elements.  The Kupers do, however, dispute the first and fourth elements of the objection – *i.e.*, that the paycheck was concealed and the concealment was undertaken with the intent to hinder, delay, or defraud creditors or the Trustee.

With respect to both concealment and intent to hinder, delay, or defraud, BNM appears to rely upon the Kupers' failure to list the April Paycheck in their schedules.  The Kupers explained, however, that the paycheck was not referenced because the schedules were completed and signed on April 8, 2020, seventeen days before Mr. Kuper received the paycheck.  And while the purposeful delay in commencing a case with a stale set of schedules might, under certain circumstances, constitute evidence of a calculated plan to conceal an asset with an intent to hinder, delay, or defraud, here the Kupers credibly testified that they did not know that there would be a delay in the commencement of their case.  Instead, the delay was caused by their counsel on account of complications brought about by the COVID-19 pandemic.

Thus, the Court finds that BNM has not carried its burden of proving by a preponderance of the evidence that the Kupers concealed the April Paycheck with an intent to hinder, delay, or defraud any of their creditors or the Trustee.

### 3.    *The BBVA Account*

Finally, BNM focuses on the BBVA Account, similarly asserting that the Kupers intentionally concealed the existence of the account with an intent to hinder, delay, or defraud.  In relation thereto, the Kupers do not contest the third element of BNM's § 727(a)(2)(A) objection – *i.e.*, that the alleged action/inaction complained of took place within one year of the Petition Date – and the Court finds that BNM successfully proved such element.  All other elements of the objection are contested.

With respect to the second element of the objection – *i.e.*, that the BBVA Account belonged to the Kupers – the Kupers successfully established that, while Mrs. Kuper was technically a co-holder of the account due to Cameron's age of minority, in reality the account solely belonged to, and was solely used by, Cameron.  Similarly, with respect to the first and final elements of the § 727(a)(2)(A) objection, the Kupers convincingly established that, given their belief that they held no true ownership interest in the account and that Mrs. Kuper was only a nominal account holder to facilitate their son's ownership of the account, they neither concealed the BBVA Account nor intended to hinder, delay, or defraud anyone.

For these reasons, the Court also finds that BNM has failed to carry its burden of proving by a preponderance of the evidence that the Kupers concealed the BBVA Account with an intent to hinder, delay, or defraud any of their creditors or the Trustee.

### B.    *The Section 727(a)(4) Objections*

In relevant part, section 727(a)(4) of the Bankruptcy Code provides for the denial of a chapter 7 discharge to a debtor if "the debtor knowingly and fraudulently, in or in connection with

the case … made a false oath or account."[45]  Thus, based upon such statutory language, to establish that a discharge should be denied a debtor under § 727(a)(4)(A), a creditor must establish the following five elements: (1) the debtor made a statement under oath in, or in connection with, the bankruptcy case; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.[46]  An objecting creditor bears the burden of proving each of these elements by a preponderance of the evidence.[47]

In relation to intent, an objecting party may prove fraudulent intent by showing either an actual intent to deceive on the part of the debtor or the debtor's reckless indifference to the truth.[48] In the case of recklessness indifference, while it has been recognized that "a discharge cannot be denied when items are omitted from the schedules by honest mistake,"[49] it has also been recognized that "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."[50]  Turning to the element of materiality, for purposes of § 727(a)(4)(A) materiality is not solely dependent upon the value of omitted assets or whether the omission was detrimental to creditors;[51] rather, "[t]he subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the

---

[45] *See* 11 U.S.C. § 727(a)(4)(A).

[46] *Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016); *Duncan*, 562 F.3d at 695.

[47] *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862 (5th Cir. 2004); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

[48] *Packer*, 816 F.3d at 95; *see also Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.), *cert. denied*, 534 U.S. 1042 (2001).

[49] *Beaubouef*, 966 F.2d at 178; *see also Neary v. Harding (In re Harding)*, Adversary No. 14-03078, 2015 WL 222482, at *5 (Bankr. N.D. Tex. Jan. 14, 2015).

[50] *Duncan*, 562 F.3d at 695; *see also Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366-67 (Bankr. N.D. Tex. 2010).

[51] *Pratt*, 411 F.3d at 566 (citing *Beaubouef*, 966 F.2d at 178 (quoting 4 Collier on Bankruptcy, ¶ 727.04[1], at 727–59 (15th ed. 1992))).

bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[52]  Of final note, while the burden of proof always remains on the objector, once an objector has presented evidence of a material false oath, the burden shifts to the debtor to present evidence that the debtor is innocent of the charged offense.[53]

Here, BNM's focus is on the April Paycheck, BBVA Account, FW Medical-Related Liabilities, and the Kupers' income.  In particular, BNM asserts that the Kupers made false statements or omissions, as applicable, in relation to each of these matters in their sworn schedules, SOFA, or Statement of Current Monthly Income, as applicable.  In that regard, false oaths under § 727(a)(4)(A) include false statements or omissions made by a debtor in the debtor's schedules, statement of financial affairs, or other sworn statements.[54]  "The bankruptcy schedules and statement of financial affairs of a debtor serve a vital role for creditors in a bankruptcy case, in that they ensure that adequate and truthful information is available to trustees and creditors … without the need for further investigation to determine whether or not the information is true and correct."[55] Hence, a debtor has "a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all requests."[56]

With the foregoing in mind, on April 8, 2020, the Kupers executed a declaration in support of their schedules wherein they affirmed under penalty of perjury that they had read the schedules and that they were true and correct as of such date.[57]  Similarly, on the same date the Kupers executed their SOFA with the inclusion of an affirmation under penalty of perjury that they had

---

[52] See Pratt, 411 F.3d at 566 (quoting Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984)).

[53] Duncan, 562 F.3d at 696.

[54] See Beaubouef, 966 F.2d at 178.

[55] Mullen v. Jones (In re Jones), 445 B.R. 677, 726-27 (Bankr. N.D. Tex. 2011); see also Beaubouef, 966 F.2d at 179.

[56] Hughes v. Wells (In re Wells), 426 B.R. 579, 599 (Bankr. N.D. Tex. 2006) (quoting Morton v. Dreyer (In re Dreyer), 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991)).

[57] See Defs.' Exh. 1, at p.38.

read all of the answers in the SOFA and that they were true and correct as of April 8, 2020.[58]

Finally, in executing their Statement of Current Monthly Income on April 8, 2020, the Kupers

again affirmed under penalty of perjury that the information set out in the statement was true and

correct as of such date.[59]

### 1.    The April Paycheck

First, BNM asserts that the Kupers made a false oath in relation to the April Paycheck by

failing to disclose it as an asset on their schedules.  The Kupers counter that because the schedules

were completed and signed on April 8, 2020, prior to Mr. Kuper's receipt of the April Paycheck,

the omission was not inaccurate.  The Court agrees.  While, ideally, the Kupers should have

amended their schedules after the bankruptcy filing to account for any changes in their assets

between April 8, 2020 and the Petition Date, that does not change the fact that, as of the time of

the Kupers' execution of the schedules under oath, they did not make a false statement through

omission with respect to the April Paycheck.  BNM does not point to any other statement made

under oath by the Kupers with respect to the April Paycheck.

Therefore, the Court finds that BNM has failed to carry its burden of proving by a

preponderance of the evidence that the Kupers knowingly and fraudulently made a false oath in

relation to the April Paycheck.

### 2.    The BBVA Account

BNM next asserts that the Kupers made a false oath in relation to the BBVA Account by

failing to disclose it as an asset on their schedules.  The Kupers dispute the contention, claiming

that their son, Cameron, was the only true owner of the account, as previously discussed.

Moreover, even if Mrs. Kuper held some form of bare legal interest in the account as a co-holder,

---

[58] *See id.*, at p.46.

[59] *See id.*, at p.62.

the Kupers dispute having consciously determined to omit disclosure of such bare legal interest with a fraudulent intent.  The Court agrees.  The Kupers convincingly established that the account was intended for the sole use of their son, Cameron, the account was, in fact, solely used by Cameron, and that the funds in the account at all times belonged solely to Cameron.[60]

Accordingly, the Court finds that BNM has failed to carry its burden of proving by a preponderance of the evidence that the Kupers knowingly and fraudulently made a false oath in relation to the BBVA Account.

### 3.    The FW Medical-Related Debts

Third, BNM asserts that the Kupers falsely listed the FW Medical-Related Debts on Schedule E/F, their schedule of unsecured debts owed by the Kupers.  According to BNM, the Kupers were not personally liable for such debts; instead, FW Medical was solely liable for such debts.  The Kupers disagree, countering that in the case of the Anda debt, Mr. Kuper had executed a personal guaranty, that in the case of Capital One, the credit card was held in the name of Mr. Kuper (and, in fact, Capital One had obtained a judgment against the Kupers), and that in the case of Express Scripts, the Kupers had a good faith belief that they had liability for the overpayment due to their deposit of the overpayment in their personal account, all as more fully described above.  The Kupers additionally testified credibly that, even if the listing of any of these debts was inaccurate, it was not done with any fraudulent intent inasmuch as they had determined, in good faith, to list such debts based upon the advice received from bankruptcy counsel to include any debt on their schedules for which they reasonably believed they could be held personally liable.[61]

---

[60] *See, e.g., Pratt*, 411 F.3d at 567 (discussing a similar situation in which an objection discharge was overruled).

[61] *See Dreyer*, 127 B.R. at 597 ("A debtor's reliance on advice of counsel constitutes an excuse for [an error or omission] . . . where his reliance is reasonable and in good faith").

Based upon the evidence introduced, the Court concludes that the Kupers did not make any false statements in including the FW Medical-Related Debts on Schedule E/F. Moreover, even if the listings were inaccurate in any respect, the Court finds that there was no fraudulent intent on the part of the Kupers in scheduling the debts. The Court also notes that a chapter 7 debtor's identification of debts on Schedule E/F does not result in the deemed allowance of such claims against the estate. The scheduling is effectively informational only with the separate filing of a proof of claim required by a creditor to evidence its claim and participate in distributions from the bankruptcy estate.[62]

Consequently, the Court finds that BNM has failed to carry its burden of proving by a preponderance of the evidence that the Kupers knowingly and fraudulently made a false oath in relation to the FW Medical-Related Debts.

### 4.    *The Kupers' Income*

Finally, BNM asserts that the Kupers knowingly and fraudulently understated the Kupers' income level on Schedule I and their Statement of Current Monthly Income. Each of these contentions is considered in turn.

First, BNM asserts that the Kupers knowingly and fraudulently understated their income by failing to include the April Paycheck in their income calculations. Among other things, BNM suggests that the Kupers purposefully delayed their deposit of the April Paycheck until after the Petition Date so as to intentionally under-report their income. Initially, as previously indicated, all of the relevant sworn disclosures were executed on April 8, 2020, well before Mr. Kuper even received the April Paycheck, and the Kupers were neither responsible for the delay in the filing of

---

[62] While in a chapter 11 case the scheduling of a claim as liquidated, undisputed and non-contingent constitutes the deemed filing of a proof of claim on behalf of a creditor, thereby entitling the claim to allowance in the absence of objection, the same is not true in a chapter 7 case. In a chapter 7 case, claims must be evidenced by the actual filing of a proof of claim. *See* 11 U.S.C. §§ 502(a) and 1111(a); Fed. R. Bankr. P. 3002(a) and 3003(b)(1).

their bankruptcy case nor aware that there would be any such delay. Thus, because the April Paycheck was not in existence at the time of the execution of the sworn statements, necessarily none of the statements was false on account of a failure to include reference to the April Paycheck.

Additionally, the Kupers dispute that they undertook any action with fraudulent intent. In reference to the suggestion that the Kupers intentionally delayed deposit of the April Paycheck until after the Petition Date, for example, Mr. Kuper credibly testified that he did not deposit the paycheck until May 2, 2020, because the nearest branch location of their bank was six miles away from the Kupers' home.

Separately, BNM alleges that the Kupers fraudulently understated their household income on Schedule I by failing to take into account the income of their dependents. At trial, Mr. Kuper provided detailed testimony regarding how the Kupers determined their household income. In the case of the income of their dependents, the Kupers credibly testified that because they never used any of the income of their dependents to pay for any of the household expenses, they did not believe that it was properly includable in their income calculations. The Court found such explanation to be credible, at least insofar as demonstrating a lack of fraudulent intent on their part in omitting such income from all relevant schedules and statements. Importantly, it is a "basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[63]

For these reasons, the Court finds that BNM has failed to carry its burden of proving by a preponderance of the evidence that the Kupers knowingly and fraudulently made a false oath in relation to their income.

---

[63] *Packer*, 816 F.3d at 91 (quoting *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)); *see also Crumley*, 428 B.R. at 356.

### C.        Nondischargeability Under Section 523(a)(2)(A)

Finally, section 523(a)(2)(A) of the Bankruptcy Code provides in relevant part that a chapter 7 discharge obtained by an individual debtor does not discharge the debtor from any debt for "services … to the extent obtained by … a false representation [] or actual fraud …, other than a statement respecting the debtor's or an insider's financial condition."[64]

To establish the nondischargeability of a debt under § 523(a)(2)(A) by false representation, a creditor must prove (1) the debtor made a false representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.[65]  In relation to the making of a false representation, a representation by someone other than the debtor may be imputed to the debtor if the non-debtor party was an agent of the debtor at the time of the representation and was made within the scope of authority granted by the debtor to the non-debtor party.[66]  Turning to intent to deceive, a creditor must show that the debtor intended or at least had "reason to expect a creditor to act, or refrain from action, in reliance upon the debtor's representations."[67]  A court may infer such intent "from a 'reckless disregard for the truth or falsity of the statement combined with the sheer magnitude of the resulting misrepresentation.'"[68] However, a debtor's "honest belief … that a representation is

---

[64] 11 U.S.C. § 523(a)(2)(A).

[65] *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th Cir. 2018) (citing *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001)).

[66] *See Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 & n.6 (5th Cir. 1992); *see also Veritex Cmty. Bank v. Osborne (In re Osborne)*, 951 F.3d 691, 703 (5th Cir. 2020).

[67] *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133 (Bankr. N.D.Tex. 2005) (citing *Mercer*, 246 F.3d at 391).

[68] *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 383 (Bankr. N.D. Tex. 2017) (quoting *General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005)).

true … does not amount to an intent to deceive," even if that honest belief is unreasonable.[69] Finally, for justifiable reliance a creditor is not required to establish that the reliance was reasonable, only that it was justifiable. Reliance is "justifiable" if the existence of the intention is material and the recipient has reason to believe that it will be carried out.[70] A creditor's reliance may be found justifiable "*unless* its falsity is obvious or there are '*red flags*' indicating such reliance is unwarranted."[71]

Turning to nondischargeability under § 523(a)(2)(A) by actual fraud, the Supreme Court explained in *Husky International Electronics v. Ritz* that "actual fraud" "encompasses forms of fraud … that can be effected without a false representation."[72] To prove nondischargeability by actual fraud, a creditor must prove: (1) the debtor engaged in fraudulent conduct; (2) the debtor undertook such action with wrongful intent; and (3) the creditor sustained a loss as a proximate result.[73] In other words, excepting the discharge or a debt for actual fraud "requires proof of fraudulent conduct involving moral turpitude or for the purpose of committing an intentional wrong."[74]

In each case, BNM has the burden of proving nondischargeability under § 523(a)(2)(A) by a preponderance of the evidence.[75]

---

[69] *Clem*, 583 B.R. at 383.

[70] *See Mercer*, 246 F.3d at 416-18.

[71] *Id.* at 418; *see also Wright v. Minardi (In re Minardi)*, 536 B.R. 171, 187 (Bankr. E.D.Tex. 2015).

[72] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359 (2016).

[73] *Dare v. Jenkins (In re Jenkins)*, 607 B.R. 270, 283 (Bankr. N.D. Tex. 2019).

[74] *Id.*

[75] *Grogan v. Garner*, 498 U.S. 279, 289–91 (1991).

### 1.    *The Alleged False Representations*

BNM asserts that Mr. Kuper falsely represented that Dr. Malouf would provide payment to BNM on Mr. Kuper's behalf.  BNM further contends that Mr. Kuper enlisted Mrs. Moore's assistance in falsely representing to BNM that the Moores would take out loans with the credit support of the Moores' pharmacies and refinance their own home in order to raise funds to help pay down BNM's invoices.  Both Mr. Kuper and Mrs. Moore deny making any false representations.  Of note, BNM points to no representations by or on behalf of Mrs. Kuper.

Focusing first on Mr. Kuper, while Mr. Kuper has stipulated that he did, in fact, represent to BNM that Dr. Malouf would assist with the cost of Mr. Kuper's defense, the Court additionally finds that Mr. Kuper, in fact, believed that such representation was truthful at the time that it was made and that he had no knowledge of Dr. Malouf's intent to later renege on Dr. Malouf's own direct assurances to BNM.  Indeed, on October 1, 2019, prior to the sale of Dr. Malouf's house, Mr. Kuper pressed Dr. Malouf to come forward with the financial assistance promised, warning him of the negative consequences that could result to both of them in the absence of such assistance.  It was not until after the trial had concluded that Mr. Kuper learned of the house sale and the failure of Dr. Malouf to fund.

Next, with respect to Mrs. Moore, there are two problems with BNM's theory for relief. First, the Court finds that BNM failed to establish that Mrs. Moore was authorized to act as Mr. Kuper's agent in relation to discussions with BNM about Mr. Kuper's outstanding fees and expenses.  At the time that Mr. Ansley approached the Moores to discuss Mr. Kuper's mounting legal fees, Mrs. Moore had not discussed the matter with Mr. Kuper and had no knowledge of the problem.  As explained by Mrs. Moore, she was caught off guard by Mr. Ansley's report and request for the Moores to assist.  Second, the Court also finds that BNM failed to establish that Mrs. Moore made any false representations.  In this regard, the evidence at trial established, at

best, that Mrs. Moore understandably expressed a desire to assist her brother in whatever way she could and that she and her husband then followed through on that assurance in providing a home equity loan to the Kupers so that Mr. Kuper would then have additional funds available to pay down the legal fees and expenses.  Mr. Kuper, in fact, used the funds to pay down the outstanding balance of fees and expenses owed.

Finally, with respect to the alleged representations of both Mr. Kuper and Mrs. Moore, BNM failed present evidence of any justifiable reliance on such representations.  On June 28, 2019, prior to any of the alleged representations being made, Mr. Kuper candidly informed Mr. Ansley about his inability to pay and offered to let him and BNM out of the engagement and to pivot to a public defender.  Mr. Ainsley declined because, given the proximity to trial, he did not believe the court would permit a withdrawal.  In other words, regardless of any representations thereafter made by Mr. Kuper, Mrs. Moore, Dr. Malouf, or anyone else, BNM (through Mr. Ansley) had already determined to represent Mr. Kuper through the conclusion of trial.

Consequently, the Court finds that BNM has failed to carry its burden of proving by a preponderance of the evidence that the BNM Debt was for services obtained by a false representation.

### 2. Actual Fraud Regarding Financial Assistance

In relation to actual fraud, BNM appears to rely upon the same alleged misrepresentations as the operative fraudulent conduct at issue.[76]  As such, for the same reasons as stated above, BNM has failed to make out a case for actual fraud because the conduct at issue was not fraudulent in nature.  Moreover, BNM has failed to prove by a preponderance of the evidence any fraudulent intent on the part of either of the Kupers.  Finally, because BNM had already determined to proceed

---

[76] *See* Joint Pretrial Order, ¶ I.A., at pp.2-3.

to trial by the time of the complained of representations and actions in relation thereto, BNM has also failed to carry its burden establishing that any portion of the BNM Debt was incurred as a proximate result of any the complained of representations or actions in relation thereto.

Accordingly, BNM has likewise failed to prove by a preponderance of the evidence that the BNM Debt was for services obtained by actual fraud.

## CONCLUSION

For all of the foregoing reasons, BNM's objections under 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4) to the grant of a discharge to the Kupers will be overruled and BNM's request for a determination of nondischargeability of the BNM Debt under 11 U.S.C. § 523(a)(2)(A) will be denied.  The Court will separately enter a final judgment in conformity herewith.

# # #   END OF MEMORANDUM OPINION   # # #